Kavanaugh, Circuit Judge, with whom Senior Circuit Judge Randolph joins, dissenting: Introduction and Summary This is a case about executive power and individual liberty. To prevent tyranny and protect individual liberty, the Framers of the Constitution separated the legislative, executive, and judicial powers of the new national government. To further safeguard liberty, the Framers insisted upon accountability for the exercise of executive power. The Framers lodged full responsibility for the executive power in a President of the United States, who is elected by and accountable to the people. The first 15 words of Article II speak with unmistakable clarity about who controls the executive power: “The executive Power shall be vested in a President of the United States of America.” U.S. Const, art. II, § 1. And Article II assigns the President alone the authority and responsibility to “take Care that the Laws be faithfully executed.” Id. § 3. The purpose “of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom.” Morrison v. Olson, 487 U.S. 654, 727, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). Of course, the President executes the laws with the assistance of subordinate executive officers who are appointed by the President, often with the advice and consent of the Senate. To carry out the executive power and be accountable for the exercise of that power, the President must be able to supervise and direct those subordinate officers. In its landmark decision in Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), authored by Chief Justice and former President Taft, the Supreme Court recognized the President’s Article II authority to supervise, direct, and remove at will subordinate officers in the Executive Branch. In 1935, however, the Supreme Court carved out an exception to Myers and Article II by permitting Congress to create independent agencies that exercise executive power. See Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). An agency is “independent” when the agency’s commissioners or board members are removable by the President only for cause, not at will, and therefore are not supervised or directed by the President. Examples of independent agencies include well-known bodies such as the Federal Trade Commission, the Federal Communications Commission, the Securities and Exchange Commission, the National Labor Relations Board, and the Federal Energy Regulatory Commission. Those and other independent agencies exercise executive power by bringing enforcement actions against private citizens. Those agencies often promulgate legally-binding regulations pursuant to statutes enacted by Congress, and they adjudicate disputes involving private parties. So those agencies exercise executive, quasi-legislative, and quasi-judicial power. The independent agencies collectively constitute, in effect, a headless fourth branch of the U.S. Government. They hold enormous power over the economic and social life of the United States. Because of their massive power and the absence of Presidential supervision and direction, independent agencies pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances. To mitigate the risk to individual liberty, the independent agencies historically have been headed by multiple commissioners or board members. In the Supreme Court’s words, each independent agency has traditionally been established as a “body of experts appointed by law and informed by experience.” Humphrey’s Executor, 295 U.S. at 624, 55 S.Ct. 869. Multi-member independent agencies do not concentrate all power in one unaccountable individual, but instead divide and disperse power across multiple commissioners or board members. The multi-member structure thereby reduces the risk of arbitrary deci-sionmaking and abuse of power, and helps protect individual liberty. In other words, the heads of executive agencies are accountable to and checked by the President; and the heads of independent agencies, although not accountable to or checked by the President, are at least accountable to and checked by their fellow commissioners or board members. No independent agency exercising substantial executive authority has ever been headed by a single person. Until now. In the Dodd-Frank Act of 2010, Congress created a new independent agency, the Consumer Financial Protection Bureau. As originally proposed by then-Professor and now-Senator Elizabeth Warren, the CFPB was to be another traditional, multi-member independent agency. The initial Executive Branch proposal from President Obama’s Administration likewise envisioned a multi-member independent agency. The House-passed bill sponsored by Congressman Barney Frank and championed by Speaker Nancy Pelosi also contemplated a multi-member independent agency. But Congress ultimately departed from the Warren and Executive Branch proposals, and from the House bill sponsored by Congressman Frank. Congress established the CFPB as an independent agency headed not by a multi-member commission but rather by a single Director. The Director of the CFPB wields enormous power over American businesses, American consumers, and the overall U.S. economy. The Director unilaterally implements and.enforces 19 federal consumer protection statutes, covering everything from home finance to student loans to credit cards to banking practices. The Director alone may decide what rules to issue. The Director alone may decide how to enforce, when to enforce, and against whom to enforce the law. The Director alone may decide whether an individual or entity has violated the law. The Director alone may decide what sanctions and penalties to impose on violators of the law. Because the CFPB is an independent agency headed by a single Director and not by a multi-member commission, the Director of the CFPB possesses more unilateral authority—that is, authority to take action on one’s own, subject to no check— than any single commissioner or board member in any other independent agency in the Ü.S. Government. Indeed, other than the President, the Director enjoys more unilateral authority than any other official in any of the three branches of the U.S. Government. That combination—power that is massive in écope, concentrated in a single person, and unaccountable to the President— triggers the important constitutional question at issue in this case. The petitioner here, PHH, is a mortgage lender and was the subject of a CFPB enforcement action that resulted in a $109 million sanction. In seeking to vacate the CFPB’s order, PHH argues that the GFPB’s novel structure—an independent agency headed by a single Director—violates Article II of the Constitution.-1 agree with PHH. Three considerations inform my Article II analysis: history, liberty, and Presidential authority. First, history. In separation of powers cases, the Supreme Court has repeatedly emphasized the significance of historical practice. See, e.g., NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014); Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). The single-Director structure of the CFPB represents a gross departure from settled historical practice. Never before has an independent agency exercising substantial executive authority been headed by just one person. That history matters. In Free Enterprise Fund, in invalidating the novel structure of another newly created independent agency, the Public Company Accounting Oversight Board, the Supreme Court stated: “Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity.” Id. at 505, 130 S.Ct. 3138. Here too: Perhaps the most telling indication of the severe constitutional problem with the CFPB is the lack of historical precedent for this "entity. Second, liberty. The CFPB’s concentration -of enormous power in a single unaccountable, unchecked Director poses a far greater risk' of arbitrary decisionmaking and abuse of power, and a far greater threat to individual liberty, than a multi-member independent agency does. The overarching constitutional concern with independent agencies is that the agencies exercise executive power but are unchecked by the President, the official who is accountable to the people and who is responsible under Article II for the exercise of executive power. In lieu of Presidential control, the multi-member structure of independent agencies operates as a critical substitute check on the excesses of any individual independent agency head. This new agency, the CFPB, lacks that critical check,, yet still wields vast power over American businesses and consumers. This "wolf comes as a wolf.” Morrison, 487 U.S. at 699, 108 S.Ct. 2597 (Scalia, J., dissenting). Third, Presidential authority. The Single-Director CFPB diminishes the President’s Article II authority to control the Executive Branch more than traditional multi-member independent agencies do. In comparable multi-member independent agencies such as the Federal Trade Commission (to which the CFPB repeatedly compares itself), the President ordinarily retains power to designate the chairs of the agencies and to remove chairs at will from the chair position, As a result, Presidents can maintain at least some influence over the general direction of the agencies. Soon after a new President enters office, the new President typically designates new chairs. Those independent agencies therefore flip to control by chairs who are aligned with the new President. For example, shortly after he took office on January 20, 2017, President Trump designated new Chairs of the Federal Trade Commission, the Federal Communications Commission, the Securities and Exchange Commission, and the National Labor Relations Board,, among others. President Obama did. the same within a few weeks of taking office in 2009. A President possesses far less influence over the single-Director CFPB. Thé single CFPB Director serves a fixed five-year term and, absent good cause, may not be replaced by the President, even by a newly elected President.' The Upshot is that a President may be stuck for years with a CFPB Director who was appointed by the prior President and who vehemently opposes the current President’s agenda. To illustrate, upon taking office in January 2017, the President could not appoint a new Director of the CFPB, at least absent good cause for terminating the existing Director. It will get worse in the future. Any new President who is elected in 2020, 2024, or 2028 may spend a majority of his or her term with a CFPB Director who was appointed by a prior President. That does not happen with the chairs of the traditional multi-member independent agencies. That dramatic and meaningful difference vividly illustrates that the CFPB’s novel single-Director structure diminishes Presidential power more than traditional multi-member independent agencies do. In sum, because of the consistent historical practice in which independent agencies have been headed by multiple commissioners or board members; because of the serious threat to individual liberty posed by a single-Director independent agency; and because of the diminution of Presidential authority caused by this single-Director independent agency, I conclude that the CFPB violates Article II of the Constitution. Under Article II, an independent agency that exercises substantial executive power may not be headed by a single Director. As to remedy, I agree with the United States as amicus .curiae: The Supreme Court’s Free Enterprise Fund decision and the - Court’s other severability precedents require that we sever the CFPB’s for-cause provision, so that the Director of the CFPB is supervised, directed, and removable at will by the President. I. History. I begin by describing the history of independent agencies in general and of the CFPB in particular. That history demonstrates that, in order to comply with Article II, independent agencies exercising substantial executive power must be structured as multi-member agencies. A As the Supreme Court has explained, our Constitution “was adopted to enable the people to govern themselves, through their elected leaders,” and the Constitution “requires that a President chosen by the entire Nation Oversee the execution of the laws.” Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 499, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Article II of the Constitution provides quite simply: “The executive Power shall be vested in a President of the United States of America.” U.S. Const, art. II, § 1. And Article II assigns the President alone- the authority and responsibility to “take Care that the Laws be faithfully executed.” Id. §' 3. Article II makes “emphatically clear from stárt to finish” that the President is “personally responsible for his branch.” Akhil Reed Amar, America’s Constitution; A Biography 197 (2005). To exercise the executive power, the President must be assisted by subordinates. The Framers anticipated and provided for executive departments, and for officers (principal and inferior) in those departments who would assist the President. See U.S. Const, art. II, § 2. In 1789, soon after being sworn in, the First Congress established new executive Departments of Foreign Affairs, War, and Treasury, and created various offices in those new Departments. In order to control the exercise of executive power and take care that the laws are faithfully executed, the President must be able to supervise and direct those subordinate executive officers. As James Madison stated during the First Congress, “if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.” 1 Annals Of Congress 463 (Madison) (1789) (Joseph Gales ed., 1834); see also Neomi Rao, Removal: Necessary and Sufficient for Presidential Control, 65 Ala. L. Rev. 1205, 1215 (2014) (“The text and structure of Article II provide the President with the power to control subordinates within the executive branch.”). To supervise and direct executive officers, the President must be able to remove those officers at will. Otherwise, a subordinate could ignore the President’s supervision and direction without fear, and the President could do nothing about it. See Bowsher v. Synar, 478 U.S. 714, 726, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (“Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.”). The Article II chain of command therefore depends on the President’s removal power. As James Madison explained during the First Congress: “If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.” 1 Annals of Congress 499 (Madison). In 1789, the First Congress confirmed that Presidents may remove executive officers at will. As the Supreme Court has explained: “The removal of executive officers was discussed extensively in Congress when the first executive departments were created. The view that ‘prevailed, as most consonant to the text of the Constitution’ and ‘to the requisite responsibility and harmony in the Executive Department,’ was that the executive power included a power to oversee executive officers through removal.” Free Enterprise Fund, 561 U.S. at 492, 130 S.Ct. 3138 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 Documentary History of the First Federal Congress 893 (2004)). That Decision of 1789 “soon became the settled and well understood construction of the Constitution.” Free Enterprise Fund, 561 U.S. at 492, 130 S.Ct. 3138. To summarize: “The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else.” Id, at 513-14,130 S.Ct. 3138. But that bedrock constitutional principle was challenged in the late 1800s and the early 1900s. As part of the Progressive Movement and an emerging belief in expert, apolitical, and scientific answers to certain public policy questions, Congress began creating new agencies that were independent of the President but that exercised combined powers: the executive power of enforcement, the legislative power of issuing binding legal rules, and the judicial power of deciding adjudications and appeals. The heads of those independent agencies were removable by the President only for cause, not at will, and were neither supervised nor directed by the President. Some early examples included the Interstate Commerce Commission (1887) and the Federal Trade Commission (1914). Importantly, the independent agencies were multi-member bodies: They were designed as non-partisan expert agencies that could neutrally and impartially issue rules, initiate law enforcement actions, and conduct or review administrative adjudications. The constitutionality of those independent agencies was called into doubt by the Supreme Court in the 1926 Myers decision written by Chief Justice and former President Taft. In that case, the Supreme Court ruled that, under Article II, the President must be able to supervise, direct, and remove at will executive officers. The Court stated: When “the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.” Myers v. United States, 272 U.S. 52, 122, 47 S.Ct. 21, 71 L.Ed. 160 (1926). The Myers Court’s articulation of the President’s broad removal power appeared to mean that Congress could no longer create independent agencies. Indeed, Congress itself read Myers that way. For several years after Myers, Congress therefore did not create any new agencies whose heads were protected by for-cause removal provisions. In the 1930s, based on his reading of Article II and buoyed by Myers, President Franklin Roosevelt vigorously challenged the notion of independent agencies. President Roosevelt did not necessarily object to the existence of the agencies; rather, he objected to the President’s lack of control over the agencies. The issue came to a head in President Roosevelt’s dispute with William E. Humphrey, a commissioner of the Federal Trade Commission. Commissioner Humphrey was a Republican holdover Jfrom the Hoover Administration who, in President Roosevelt’s view, was too sympathetic to big business and too hostile to the Roosevelt Administration’s regulatory agenda. Asserting his authority under Article II, President Roosevelt fired Commissioner Humphrey. Humphrey contested the removal (and after Humphrey’s death, his representative continued the litigation in order to obtain back pay). Humphrey’s representative argued that Humphrey was protected against firing by the statute’s for-cause removal provision, and further argued that Congress could create independent agencies without violating Article II. The case reached the Supreme Court in 1935. At its core, the Humphrey’s Executor case raised the question whether Article II permitted independent agencies. Representing President Roosevelt, the Solicitor General contended that Congress could not create independent agencies. The Solicitor General relied on the text and history of Article II, as well as the Supreme Court’s 1926 decision in Myers. But notwithstanding Article II and Myers, the Supreme Court upheld the constitutionality of independent agencies—an unexpected decision that incensed President Roosevelt and helped trigger his ill-fated court reorganization proposal in 1937. See Humphrey’s Executor v. United States, 295 U.S. 602, 631-32, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). In allowing independent agencies, the Humphrey’s Executor Court'emphasized that the Federal Trade Commission was intended “to be non-partisan” and “to exercise the trained judgment of a body of experts appointed by law and informed by experience.” Id. at 624, 55 S.Ct. 869. Those characteristics, among others, led the Court to conclude that Congress could create an independent agency “wholly disconnected from the executive department,” except in its selection. Id. at 630, 625, 55 S.Ct. 869. According to the Court, Congress could limit the President’s power to remove the commissioners of the Federal Trade Commission and, by extension, Congress .could limit the President’s power to remove the commissioners and board members of similar independent agencies. Id. at 628-30, 55 S.Ct. 869. Ever since the 1935 Humphrey’s Executor decision, independent agencies have played a significant role in the U.S. Government. The independent agencies possess extraordinary authority over vast swaths of American economic and social life—from securities to antitrust to telecommunications to labor to energy. The list goes on. Importantly, however, each of the independent agencies has traditionally operated—and each continues -to operate—as a multi-member “body of experts appointed by^ law and informed by experience.” Id. at 624, 55 S.Ct. 869. Independent agencies are not headed by single Directors. ■ As Professor Amar has explained, “the Decision of 1789” has remained controlling, at least to the extent that the Decision “es-' tablished that in all. one-headed departments, the department head must be removable at will by the president.” Akhil Reed Amar, America’s Unwritten Constitution 323 (2012). The independent agency at issue here, the CFPB, arose out of an idea originally advanced by then-Professor and now-Senator Elizabeth Warren. In 2007, concerned about balkanized and inconsistent federal law enforcement of consumer protection statutes, Professor Warren encouraged Congress to create a new independent agency, a Financial Product Safety Commission. This new agency would centralize and unify federal law enforcement efforts to protect consumers. See Elizabeth Warren, Unsafe at Any Rate: If It’s Good Enough for Microwaves, It’s Good Enough for Mortgages. Why We Need a Financial Product Safety Commission, Democracy, Summer 2007, at 8,16-18, The agency proposed by Professor Warren was to operate as a traditional' multi-member independent agency. The subsequent Executive Branch proposal'by President Obama’s Administration likewise contemplated a multi-member independent agency. See Department of the Treasury, Financial Regulatory Reform: -A New Foundation: Rebuilding Financial Supervision And. Regulation 58 (2009). The originally passed House bill sponsored by Congressman Barney Frank and supported by Speaker Nancy Pelosi-similarly would have created a multi-member independent agency. See H.R. 4173, 111th Cong. § 4103 (as passed by House, Dec. 11, 2009). But Congress'ultimately departed from the Warren and Executive Branch proposals, from the House bill, and from historical practice by creating an indépendent agency with only a single Director. See Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L, No. 111-203, Title X § 1011, 124 Stat. 1376, 1964 (codified at 12 U.S.C. § 5491). The single Director of the CFPB is removable only for cause—that is, for “inefficiency, neglect of duty, or malfeasance in office”—during the Director’s fixed five-year term. See 12 U.S.C. § 5491(c)(3); cf. Humphrey’s Executor, 295 U.S. at 620. Congress’s choice of a Single-Director CFPB was not an especially considered legislative decision. No committee report or substantial legislative history delved into the benefits of single-Director independent agencies versus multi-member independent agencies. No congressional hearings studied the question/ Congress apparently stumbled into this 'single-Director structure as a compromise or landing point between the original Warren multi-member independent agency proposal and a traditional executive agency headed by a single person. Under the law as enacted, the President may not supervise, direct, or remove at will the CFPB Director. As a result, a Director appointed by a President may continue to serve in office even if the President later .wants to remove the Director based on a policy disagreement, for example. More importantly, a Director may continue to serve as Director under a new President (until the Director’s statutory five-year tenure has elapsed), even though the new President might strongly disagree with that Director about policy issues or the overall direction of the agency. Congress insulated the CFPB’s Director from Presidential influence, yet also granted the CFPB extraordinarily broad authority to implement and enforce U.S. consumer protection laws. Under the Dodd-Frank Act, the "CFPB may “implement[] the Federal consumer financial .laws through rules, orders, guidance, interpretations, statements of policy, examinations, and ■ enforcement actions.” 12 U.S.C. § 5492(10). The CFPB may “prescribe rules or issue orders or guidelines pursuant to” 19 distinct consumer protection laws. Id. § 5581(a)(1)(A); see also id. §§ 5481(14), 5512(b). That rulemaking power was previously exercised by seven different government agencies. See id. § 5581(b) (transferring to the CFPB certain “consumer financial protection functions” previously exercised by the Federal Reserve, the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Department of Housing and Urban Development, and the Federal Trade Commission). The CFPB may pursue enforcement' actions in federal court, as well as before administrative law judges. The agency may issue subpoenas requesting documents or testimony in connection with those enforcement actions. See, id. §§ 5562-5564. The CFPB may adjudicate disputes. And the CFPB may impose a wide range of legal and equitable relief, including restitution, disgorgement, money damages, injunctions, and civil monetary penalties. Id. § 5565(a)(2). All of that massive power is ultimately lodged in one person—the Director of the CFPB—who is not supervised, directed, or removable at will by the President. Because the Director acts alone and without Presidential supervision or direction, and because the CFPB wields broad authority over the U.S. economy, the Director enjoys significantly more unilateral power than any single member of any other independent agency. By “unilateral power,” I mean power .that is not checked by the President or by other commissioners or board members. Indeed, other than the President, the Director of the CFPB is the single most powerful official in the entire U.S. Government,' at least when measured in terms of unilateral power. That is not an overstatement. What about the Speaker of the House? The Speaker can pass legislation only if 218 Members agree. The Senate Majority Leader? The Leader typically needs 60 Senators to invoke cloture, and needs a majority of Senators (usually 51 Senators or 50 plus the Vice President) to approve a law or nomination. The Chief Justice? The Chief Justice must obtain four other Justices’ votes in order to prevail. The Chair of the Federal Reserve? The Chair often needs the approval of a majority of the Federal Reserve Board. The Secretary of Defense? The Secretary is supervised and directed and removable at will by the President. On any decision, the Secretary must do as the President says. So too with the Secretary of State, and the Secretary of the Treasury, and the Attorney General. To be sure, the Dodd-Frank Act requires the Director to establish and consult with a “Consumer Advisory Board.” See id. § 5494. But the advisory board is just that: advisory. The Director need not heed the Board’s advice. Without the formal authority to block unilateral action by the Director, the Advisory Board does not come close to the kind of check provided by the multi-member structure of traditional independent agencies. The Act also, in theory, allows a super-majority of the Financial Stability Oversight Council to veto certain regulations of the Director. See id. §§ 5513, 5321. But by statute, the veto power may be used only to prevent regulations (not to overturn enforcement actions or adjudications); only when two-thirds of the Council members agree; and only when a particular regulation puts “the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk,” a standard unlikely to be met in practice in most cases. Id. § 5513(c)(3)(B)(ii); see S. Rep. No. 111-176, at 166 (“The Committee notes that there was no evidence provided during its hearings that consumer protection regulation would put safety and soundness at risk.”); see also Todd Zywicki, The Consumer Financial Protection Bureau: Savior or Menace?, 81 Geo. Wash. L. Rev. 856, 875 (2013) (“[Sjubstantive checks on the CFPB can be triggered ... only under the extreme circumstance of a severe threat to the safety and soundness of the American financial system. It is likely that this extreme test will rarely be satisfied in practice.”); Recent Legislation, Dodd-Frank Act Creates the Consumer Financial Protection Bureau, 124 Harv. L. Rev. 2123, 2129 (2011) (“[T]he high standard for vetoing regulations ... will be difficult to establish.”). In this case, for example, the veto power could not have been used to override the CFPB’s statutory interpretation or its enforcement action against PHH. The Act also technically makes the CFPB part of the Federal Reserve for certain administrative purposes. See, e.g., 12 U.S.C. § 5491(a); see also id. § 5493. ' But that is irrelevant to the present analysis because the Federal Reserve Board may not supervise, direct, or remove the CFPB Director. In short, when measured in terms of unilateral power, the Director of the CFPB is the single most powerful official in the entire U.S. Government, other than the President. Indeed, within his jurisdiction, the Director of the CFPB is even more powerful than the President. The Director’s view of consumer protection law and policy prevails over all others. In essence, the Director of the CFPB is the President of Consumer Finance. The concentration of massive, unchecked power in a single Director marks a dramatic departure from settled historical practice and makes the CFPB unique among independent agencies, as I will now explain. B As a single-Director independent agency exercising substantial executive authority, the CFPB is the first of its kind and an historical anomaly. Until this point in U.S. history, independent agencies exercising substantial executive authority have all been multi-member commissions or boards. A sample list includes: • Interstate Commerce Commission (1887) • Federal Reserve Board (1913) • Federal Trade Commission (1914) • U.S. International Trade Commission (1916) • Federal Deposit Insurance Corporation (1933) • Federal Communications Commission (1934) • National Mediation Board (1934) • Securities and Exchange Commission (1934) • National Labor Relations Board (1935) • Federal Maritime Commission (1961) • National Transportation Safety Board (1967) • National Credit Union Administration (1970) • Occupational Safety and Health Review Commission (1970) • Postal Regulatory Commission (1970) • Consumer Product Safety Commission (1972) • Nuclear Regulatory Commission (1974) • Federal Energy Regulatory Commission (1977) • Federal Mine Safety and Health Review Commission (1977) • Federal Labor Relations Authority (1978) • Merit Systems Protection Board (1978) • Defense Nuclear Facilities Safety Board (1988) • National Indian Gaming Commission (1988) • Chemical Safety and Hazard Investigation Board (1990) • Surface Transportation Board (1995) • Independent Payment Advisory Board (2010).[1] Have there been any independent agencies headed by a single person? In an effort to be comprehensive, the three-judge panel in this ease issued a pre-argument order asking the CFPB for all historical or current-examples it could find of independent agencies headed by a single person. The CFPB found only three examples: the.Social Security Administration, the Office of-Special Counsel, and the Federal Housing Finance Agency. At the en banc stage, the CFPB cited no additional examples. None of the three examples, however, has deep historical roots. Indeed, the Federal Housing Finance Agency has existed only since 2008, about as long as the CFPB. The other two are likewise relatively recent. And those other two have been constitutionally contested by the Executive Branch, and they do not exercise the core Article II executive power of bringing law enforcement actions or imposing fines and penalties against private citizens for violation of statutes or agency rules. For those reasons, as I will explain, the three examples are different-in kind from the CFPB. Those examples therefore do not count for much when compared to the deeply rooted historical practice of independent agencies as multi-member agencies. To borrow the words of Justice Breyer in Noel Canning, as weighed against the settled historical practice, “these few scattered examples” are “anomalies.” NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 2567, slip op. at 21, 189 L.Ed.2d 538 (2014); see also Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 505-06, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). First, the CFPB cited and primarily relied on the example of the Social Security Administration, which is an independent agency headed by a single Social Security Commissioner. See 42 U.S.C. §§ 901(a), 902(a). But the current structure of the- agency is relatively recent. The Social Security Administration long existed first as. a multi-member independent agency and then as a Single-Director executive agency within various executive departments, most recently the Department of Health and Human Services, Only in 1994 did Congress change the Social Security Administration tó a single-; Director independent agency. Important-ly, when the agency’s structure was altered in 1994,' President Clinton issued a signing statement pronouncing that the change in the agency’s structure was constitutionally problematic. See President William J. Clinton, Statement on Signing the Social Security Independence and Program Improvements Act of 1994, 2 Pub. Papers 1471, 1472 (Aug. 15, 1994). That agency’s structure- therefore is constitutionally contested. In those circumstances, the- historical precedent counts for little because it is not settled. Cf. Noel Canning, 134 S.Ct. at 2563-64, 2567, slip op. at 14-15, 20-21 (discounting example of appointments during particular inter-session recess because of Senate Committee’s strong opposition to those appointments); INS v. Chadha, 462 U.S. 919, 942 n.13, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (discounting prior legislative veto provisions' because Presidents had objected to those provisions). If anything, when considered against the “settled practice,” the Social Security example only highlights the anomaly of an independent agency headed by a single person. Noel Canning, 134 S.Ct. at 2567, slip op. at 21. Moreover, the Social Security Administration is not a precedent for the CFPB because the Social Security Commissioner does not possess, unilateral authority to bring law enforcement actions against private citizens, which is the core of the executive power and the primary threat to individual liberty posed by executive power. See Morrison v. Olson, 487 U.S. 654, 706, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). The Social Security Administration does not have power to impose fines or penalties on private citizens in Social Security benefits cases. Instead, the bulk of the Social Security Administration’s authority involves adjudication of private claims for benefits. Although the agency does possess limited power to seek civil sanctions against those who file improper claims, the Commissioner may initiate such a proceeding “only as authorized by the Attorney General,” who is an executive officer accountable to the President. 42 U.S.C. § 1320a-8(b).' Second, the CFPB cited the example of the Office, of Special Counsel, an independent agency headed by a single Special Counsel. The Office has a narrow jurisdiction and mainly enforces certain personnel rules against government employers and employees, such as the prohibition against improper political activity by government employees. Like the Social Security. Administration, the Office of Special Counsel lacks deep historical roots. It became a single-Director agency in 1978. And like the Social Security Administration, the constitutionality of the Special Counsel has been contested since its creation. Under President Carter, the Department of Justice opined that the Special Counsel “must be removable at will by the President,” and the Department opposed a for-cause restriction on removal of the Special Counsel. Memorandum Opinion for the General Counsel, Civil Service Commission, 2 Op. O.L.C. 120, 120 (1978). When Congress passed subsequent legislation regarding the Office of Special Counsel, President Reagan vetoed the bill due to “serious constitutional concerns” about the Office’s status as an independent agency. President Ronald Reagan, Memorandum of Disapproval on a Bill Concerning Whistle-blower Protection, 2 Pub. Papers 1391, 1392 (Oct. 26, 1988). The-, history of the Office of Special Counsel, confirms what one former Special Counsel has acknowledged: The agency is “a controversial anomaly in the federal system.” K, William O’Connor, Foreword to A Legislative History Op The Merit System Principles, Prohibited Personnel Practices And The Office Of The Special Counsel, at v (1985). That agency’s structure remains constitutionally contested and so is not a meaningful historical precedent for the CFPB. Moreover, the Office of Special Counsel is not a precedent for the CFPB because the Office of Special Counsel is primarily responsible for enforcing personnel laws against government ‘agencies and government employees. Unlike' the CFPB, the Officé of Special Counsel may not enforce laws against private citizens or impose fines and penalties on’ private citizens.[2] Third, the CFPB pointed to Congress’s 2008 creation of a single-Director Federal Housing Finance Agency. See Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2662 (codified at 12 U.S.C. §§ 4511-4512). That agency is. a contemporary of the CFPB and merely raises the same question we confront here. An agency created only in 2008 does not constitute an historical precedent for the CFPB. Cf. NLRB v. SW General, Inc., 137 S. Ct. 929, 943, slip op. at 17 (2017) (“ ‘[HJistorical practice’ is too grand a title for the Board’s evidence. The FVRA was not enacted until 1998 .... ”). Fourth, although not a regulatory agency precedent and not an example cited by the CFPB as precedent for its single-Director structure (for good reason), there is at least one other modern statute that created an independent entity headed by one person. It is the now-defunct independent counsel law. But the independent counsel was distinct in numerous meaningful ways from the CFPB Director. Unlike the CFPB Director, the independent counsel exercised only executive power, not rulemaking or adjudicative power. Unlike the CFPB Director, the independent counsel had only a limited jurisdiction for particular defined criminal investigations where the Department of Justice had a conflict of interest. Most importantly, unlike the CFPB Director, the independent counsel was an inferior officer, not a principal officer. The independent counsel was an inferior officer, according to the Supreme Court, because the independent counsel could be supervised and directed to some extent by the Attorney General, who is a principal executive officer accountable to the President. Given those important distinctions, the independent counsel is not an historical precedent for a single principal officer as the head of an independent regulatory agency. That is no doubt why the CFPB has not relied on the independent counsel as an historical precedent for a single-Director CFPB.[3] So in terms of historical practice, that’s all the CFPB has, and that’s not much. As Justice Breyer stated for the Supreme Court when the Court faced a similar (actually, a more robust) historical record in Noel Canning, the few examples offered by the CFPB are “anomalies.” 134 S.Ct. at 2567, slip op. at 21. Or as the Supreme Court put it in Free Enterprise Fund when confronting a similar historical record, a “handful of isolated” examples does not count for much when assessed against an otherwise settled historical practice. 561 U.S. at 505, ISO S.Ct. 3138. To be sure, in “all the laws enacted since 1789, it is always possible that Congress” created some other independent agencies that exercised traditional executive functions but were headed by single Directors. Free Enterprise Fund v. Public Company Accounting Oversight Board, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting); see also Noel Canning, 134 S.Ct. at 2567, slip op. at 21 (“There may be others of which wé are unaware.”). But “the research of the parties and the Court has not found such a needle in the haystack.” Free Enterprise Fund, 537 F.3d at 699 n.8 (Kavanaugh, J., dissenting). “Even if such an example were uncovered,” there is no question that a single-Director independent agency “has been rare at best.” Id.[4] In considering precedents for the single-Director structure of the CFPB, one may wonder about all of the executive departments and agencies headed by a single person. Why don’t they provide a precedent for the CFPB? Consider for example the Department of Justice, the Department of the Treasury, the Department of State, the Department of Defense, and the EPA, all headed by a single person. The distinction, of course, is that those departments and agencies are executive agencies. They operate within the Executive Branch chain'of command under the supervision and direction of the President, and those agency heads are removable at will by the President. The President therefore is a check on those agencies. Those agencies are accountable to the President. The President in turn is accountable to the people of the United States for the exercise of executive power in the executive agencies. So a single person at the helm of an executive agency is perfectly constitutional,[5] By contrast, independent agencies operate free of the President’s supervision and direction. Therefore,. they ■ traditionally have been headed by multiple commissioners or board members who check one another. An independent agency operates as “a body of experts appointed by law and informed by experience.” Humphrey’s Executor v. United States, 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611 (193.5). That deeply rooted- tradition—namely, that independent agencies are headed by multiple commissioners or. board members—has been widely recognized by leading judges, congressional committees, and academics who have studied the issue. Consider the following: • Justice Breyer, joined by Justices Stevens, Ginsburg, and, Sotomayor: “Agency independence is a function of several different factors ... in-cludpng] •. • composition as a multi-member bipartisan board ....” Free Enterprise Fund, 561 U.S. at 547, 130 S.Ct. 3138 (Breyer, J., dissenting). • A Senate study: “The traditional independent regulatory agency is a commission of multiple members .... The size of the commission, the length of the terms, and the fact that they do not all lapse at one time are key elements of the independent structure.” Senate Committee on Governmental Affairs, Study on Federal Regulation, S. Doc. No. 95-91, vol. 5; at 35 (1977). • The same Senate study: The “relative importance to be attached to group decision-making” is the “[cjhief” factor legislators consider when deciding whether to create an independent rather than an executive agency. Id. at 79, 47 S.Ct, 21. • Professors Breger and Edles: The multi-member agency form has become “synonymous with independence.” Marshall J. Breger & Gary J. Édles, Established by Practice: The Theory and Operation of Independent Federal Agencies, 52 Admin. L. Rev. 1111,1137 (2000). • Professor Amar: “Viewed through the prism of practice, the Constitu- ' tion allows independent agencies to be created when three factors converge: first, when an executive entity is best headed up by a committee rather than by a single officer .... ” Akhil Reed Amar, America’s Unwritten Constitution 385 (2012), • Professor Barkow: “multimember design” is one of the “[t]raditional [ljodestars” of agency independence. • Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15,26 (2010). • Professor Davis: Independent agencies should be headed by multiple members “just as we want appellate courts to be made up of plural mem- - bers, to protect against the idiosyn-cracies of a single individual.” Kenneth Culp Davis, Administrative Law . of the Seventies 15 (1976). • Professor Strauss: Independent regulatory commissions are “governmental agencies headed by multi-member boards acting collegially on the regulatory matters within their jurisdiction.” Peter L. Strauss, An Introduction to Administrative Justice in the United States 15 (1989). • Professors Bressman and Thompson: Independent agencies, unlike Executive Branch agencies, are “generally run by multi-member commissions or boards.” Lisa Schultz Bressman & Robert B. Thompson, The Future of . Agency Independence, 63 Vand. L. Rev. 599, 610 (2010). • A Harvard Law Review analysis: “Most independent agencies have multimember boards.” Recent Legislation, Dodd-Frank Act Creates the Consumer Financial Protection Bureau, 124 Harv. L, Rev. 2123, 2128 ■ (2011). The bottom line is that independent agencies historically have been headed by multiple commissioners or board members. The CFPB’s single-Director structure flouts that historical practice. See Who’s Watching the Watchmen? Oversight Of the Consume?. Financial Protection Bureau: Hearing Before the Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs of the House Committee on Oversight and Government Reform, 112th Cong. 77 (2011) (statement of Andrew Pincus) (emphasis added) (“Dodd-Frank sets up for the Bureau an imprecedented structure that consolidates more power in the director than in the head of any other, agency that regulates private individuals and entities.”); Dodd-Frank Act Creates the Consumer Financial Protection Bureau, 124 Harv. L. Rev. at 2130 (emphasis added) (“[T]he CFPB’s design is troubling because of its unprecedented nature.”); Nbte, Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection, 125 Harv. L. Rev. 1822, 1824 n.15 (2012) (emphasis added) (CFPB’s lack of a multi-member board is “atypical for independent agencies and will amplify the Director’s independence”); Todd Zywicki, The Consumer Financial Protection Bureau: Savior or Menace ? 81 Geo. Wash. L. Rev. 856, 899 (2013) (emphasis added) (“[T]he agency structure Congress chose for the CFPB—a single-director structure, devoid of accountability, and with vast, ill-defined powers—appears to be unique in recent American history.”).[6] In short, the CFPB is exceptional in our constitutional structure and unprecedented in our constitutional history. C The CFPB’s departure from historical practice matters in this case because historical practice matters to separation of powers analysis. A long line of Supreme Court precedent commands that we heed history and tradition in separation of powers cases not resolved by the constitutional text alone.[7] As Justice Breyer wrote for the Supreme Court in Noel Canning, the “longstanding practice of the government can inform our determination of what the law is.” NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 2560, slip op. at 7, 189 L.Ed.2d 538 (2014). Justice Breyer quoted James Madison’s statement that it was “foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily'used in such a charter ... and that it might require a regular course of practice to liquidate & settle the meaning of some of them.” Id., slip op. at 8. Justice Breyer explained, moreover, that the Court “has' treated practice as an important interpretive factor even when the nature or longevity of that practice.is subject to dispute, and even when that practice began- after the founding era.” Id., slip op. at 8. All of this, Justice Breyer stated, is “neither new nor controversial.’[7] Id., slip op. at 7. Considér the following: • “In separation-of-powers cases this Court has often put' significant weight upon historical practice.” Zivotofsky v. Kerry, — U.S. —, 135 S.Ct. 2076, 2091, slip op. at 20, 192 L.Ed.2d 83 (2015). • “We therefore conclude, in light of historical practice, that a recess of more than 3 days but less than 10 days is presumptively too short to fall within the Clause.” Noel Canning, 134 S.Ct. at 2567, slip op. at 21. • “Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity.” Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 505, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). • This “Court has long made clear that, when we face difficult questions of the Constitution’s structural requirements, longstanding customs and practices can make a difference.” Commonwealth of Puerto Rico v. Sanchez Valle, — U.S. —, 136 S.Ct. 1863, 1884, slip op. at 13, 195 L.Ed.2d 179 (2016) (Breyer, J., dissenting). • “[Traditional ways of conducting government ... give meaning to the Constitution.” Mistretta v. United States, 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). • “Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). • “A legislative practice such as we have here, evidenced not by only occasional instances, but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice, to be found in the origin and history of the power involved, or in its nature, or in both combined.” United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 327-28, 57 S.Ct. 216, 81 L.Ed. 255 (1936). • “Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character.” The Pocket Veto Case, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929). • “Such long practice under the pardoning power and acquiescence in it strongly sustains the construction it is based on.” Ex parte Grossman, 267 U.S. 87, 118-19, 45 S.Ct. 332, 69 L.Ed. 527 (1925). • A “page of history is worth a volume of logic.” New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921). • In “determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation.” United States v. Midwest Oil Co., 236 U.S. 459, 473, 35 S.Ct. 309, 59 L.Ed. 673 (1915). • “[W]here there is ambiguity or doubt [in the words of the Constitution], or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight.” McPherson v. Blacker, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892). • A “doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice.” McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 401, 4 L.Ed. 579 (1819). Stated simply, in separation of powers cases not resolved by the constitutional text alone, historical practice helps define the constitutional limits on the Legislative and Executive Branches.[8] The Supreme Court’s recent decisions in Free Enterprise Fund and Noel Canning illustrate how the Court relies on historical practice in the separation of powers context.[9] In Free Enterprise Fund, the Supreme Court considered the constitutionality of the new Public Company Accounting Oversight Board created by the 2002 Sarbanes-Oxley Act. Independent agency heads are ordinarily removable for cause by the President. But the new Public Company Accounting Oversight Board’s members were removable only for cause by the SEC Commissioners, and the SEC Commissioners in turn were understood to be removable only for cause by the President. In other words, there were two levels of for-cause removal between the President and the Accounting Oversight Board. The Supreme Court drew a line between one level of for-cause removal, which was the structure of traditional independent agencies, and two levels of for-cause removal, the novel structure of the new Accounting Oversight Board. The Court ruled that the latter was unconstitutional. The Court drew that line in part because historical practice had settled on allowing only one level of for-cause removal between the President and independent agency heads. There were at most “only a handful of isolated” precedents for the new Board. Free Enterprise Fund, 561 U.S. at 505, 130 S.Ct. 3138. That mattered, according to the Court: “Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity.” Id. And as the Court noted, there was a difference between one level of for-cause removal and two levels of for-cause removal in terms of an agency’s insulation from Presidential influence. See id. at 495-96, 130 S.Ct. 3138. Therefore, the Court invalidated the structure of the new Board.[10] In Noel Canning, the Supreme Court, speaking through Justice Breyer, likewise stressed the importance of history when assessing the constitutionality of a novel practice—in that case, Presidential recess appointments in Senate recesses of fewer than 10 days. The Court said: “Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress. and the President.” Noel Canning, 134 S.Ct. at 2559, slip op. at 7. Based on that ■ history, the Supreme Court ruled that a Senate recess of “less than 10 days is presumptively too short” for constitutional purposes. Id. at 2567, slip op. at 21. ’ Why 10. days? After all, the text of the Constitution does not draw any such 10-day line. The Court reasoned that the historical practice between the President and the Senate had established a 10-day line. Specifically, the Noel Canning Court stated that it had “not found a single example of a recess appointment made during an intra-session recess that was shorter than 10 days.” Id. at 2566, slip op. at 20. Although the Court did find “a few historical examples of recess appointments made during inter-session , recesses shorter than 10 days,” the Court stated: “But when considered against 200 years of, settled practice, we regard these few scattered examples as anomalies.” Id. at 2567, slip op. at 20-21. According to the Court, therefore, allowing recess appointments in Senate recesses of fewer than 10 days would depart from the settled historical practice and alter the relative powers of the President and Senate over appointments. So, too, disallowing recess appointments in Senate recesses of 10 or more days would depart from settled historical practice. In Noel Canning, the Supreme Court relied on that historical practice in defining the constitutional rule.[11] The history-based analysis of Free Enterprise Fund and Noel Canning, underscores the broader jurisprudential principle long applied by the Supreme Court: In separation of powers cases not resolved by the constitutional text alone, historical-practice matters. * * * The CFPB’s single-Director structure is without meaningful historical precedent. Here, as in Free Enterprise Fund and prior cases, the lack of historical precedent matters. To borrow the words of the Supreme Court in Free Enterprise Fund: “Perhaps the most telling indication of the severe constitutional problem” with the CFPB “is the lack of historical precedent for this entity.” 561 U.S. at 505, 130 S.Ct. 3138. II. LIBERTY The CFPB’s single-Director structure not only departs from historical practice. It also threatens individual liberty more than the traditional multi-member structure does. A The historical practice of structuring independent agencies as multi-member commissions or boards is the historical practice for á reason:. It reflects a deep and abiding concern for safeguarding the individual liberty protected by the Constitution. “The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.” Bowsher v. Synar, 478 U.S. 714, 730, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).. The “structural principles secured by the separation of powers protect the individual as well.” Stern v. Marshall, 564 U.S. 462, 483, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). As Justice Scalia stated: “The purpose of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom.” Morrison v. Olson, 487 U.S. 654, 727, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). The basic constitutional concern with independent agencies is that the agencies are unchecked by the President, the official who is accountable to the people and responsible under Article II for the exercise of executive power. Recognizing the broad and unaccountable power wielded by independent ágencies, Congress has traditionally required multi-member bodies at the helm of independent agencies. In the absence of Presidential control, the multi-member structure of independent agencies serves as a critical substitute check on the excesses of any individual independent agency head. But in this new. agency, the CFPB, that critical check is absent. And the lack, of that traditional safeguard threatens the individual liberty protected by the Constitution’s separation of powers. How does a single-Director independent agency fare worse than multi-member independent agencies in protecting individual liberty? A single-Director independent agency concentrates enforcement, rule-making, and'adjudicative power in one individual. By contrast, multi-member independent agencies do not concentrate all of that power in one individual. The multi-member structure thereby helps to prevent arbitrary decisionmaking and abuse of power, and to protect individual liberty. The point is simple but profound. In a multi-member independent agency, no single commissioner or board member can affirmatively do much of anything. Before the agency can infringe your liberty in some way—for example, by enforcing a law against you or by issuing a rule that affects your liberty or property—a majority of commissioners must agree. As a former Chair of the Federal Trade Commission has explained, it takes “a consensus decision of at least a majority of commissioners to authorize, or forbear from, action.” Edith Ramirez, The FTC: A Framework for Promoting Competition and Protecting Consumers, 83 Geo. Wash. L. Rev. 2049, 2053 (2015). That in turn makes it harder for the agency to infringe your liberty. In addition, unlike Single-Director independent agencies, multi-member independent agencies “can foster more deliberative decision making.” Kirti Datla & Richard L. Revesz, Deconstructing Independent Agencies (and Executive Agencies), 98 Cornell L. Rev. 769, 794 (2013). Multi-member independent agencies benefit from diverse perspectives and different points of view among the commissioners and board members.[12] The multiple voices and perspectives make it more likely that the costs and downsides of proposed decisions will be more fully ventilated. See Marshall J. Breger & Gary J. Edles, Established by Practice: The Theory and Operation of Independent Federal Agencies, 52 Admin. L. Rev. 1111, 1113 (2000) (independent agencies “are also multi-member organizations, a fact that tends toward accommodation of diverse or extreme views through the compromise inherent in the process of collegial decisionmaking”); Jacob E. Gersen, Administrative Law Goes to Wall Street: The New Administrative Process, 65 Admin. L. Rev. 689, 696 (2013) (A “multi-member board allows for a representation of divergent interests in a way that a single decisionmaker simply cannot.”); Glen O. Robinson, On Reorganizing the Independent Regulatory Agencies, 57 Va. L. Rev. 947, 963 (1971) (“It is not bipartisanship as such that is important; it is rather the safeguards and balanced viewpoint that can be provided by plural membership.”); cf Harry T. Edwards, The Effects of Collegiality on Judicial Decision Making, 151 U. Pa. L. Rev. 1639, 1645 (2003) (“[C]ollegiality plays an important part in mitigating the role of partisan politics and personal ideology by allowing judges of differing perspectives and philosophies to communicate with, listen to, and ultimately influence one another in constructive and law-abiding ways.”). As compared to a Single-Director independent agency structure, a multi-member independent agency structure—and its inherent requirement for compromise and consensus—will tend to lead to decisions that are not as extreme, idiosyncratic, or otherwise off the rails. Cf Stephen M. Bainbridge, Why a Board? Group Deci-sionmaking in Corporate Governance, 55 Vand. L. Rev. 1, 12-19 (2002). A multi-member independent agency can go only as far as the middle vote is willing to go. Conversely, under a single-Director structure, an agency’s policy goals “will be subject to the whims and idiosyncratic views of a single individual.” Joshua D. Wright, The Antitmst/Consumer Protection Paradox: Two Policies at War with Each Other, 121 Yale L.J. 2216, 2260 (2012); cf Recent Legislation, Dodd-Frank Act Creates the Consumer Financial Protection Bureau, 124 Harv. L. Rev. 2123, 2128 (2011) (multi-member commission structure “reduces the variance of policy and improves accuracy through aggregation”); Michael B. Rappaport, Essay, Replacing Independent Counsels with Congressional Investigations, 148 U. Pa. L. Rev. 1595, 1601 n.17 (2000) (“independent agencies tend to be headed by multimember commissions, which function to prevent aberrant actions”). Relatedly, as compared to a single-Director independent agency, a multi-mem-ber independent agency (particularly when bipartisan) supplies “a built-in monitoring system for interests on both sides because that type of body is more likely to produce a dissent if the agency goes too far in one direction.” Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15, 41 (2010). A dissent, in turn, can serve “as a ‘fire alarm’ that alerts Congress and the public at large that the agency’s decision might merit closer scrutiny.” Id.; see also Dodd-Frank Act Creates the Consumer Financial Protection Bureau, 124 Harv. L. Rev. at 2128 (the “presence of dissenters” in agency proceedings “provides new information and forces the proponent to articulate a coherent rationale, thus acting as a constraining force”). Moreover, multi-member independent agencies are better structured than single-Director independent agencies to guard against “capture” of—that is, undue influence over—independent agencies by regulated entities or interest groups, for example. As Elizabeth Warren noted in her original proposal for a multi-member consumer protection agency: “With every agency, the fear of regulatory capture is ever-present.” Elizabeth Warren, Unsafe ctó Any Rate: If It’s Good Enough for Microwaves, It’s Good Enough for Mortgages. Why We Need a Financial Product Safety Commission, Democracy, Summer 2007, at 8, 18. Capture can infringe individual liberty because capture can prevent a neutral, impartial agency assessment of what rules to issue or what enforcement actions to undertake or how to resolve adjudications. In a multi-member agency, however, the capturing parties “must capture a majority of the membership rather than just one individual.” Lisa Schultz Bressman & Robert B. Thompson, The Future of Agency Independence, 63 Vand. L. Rev. 599, 611 (2010); see also Robert E. Cushman, The Independent Regulatory Commissions 153 (1941) (noting, in reference to Federal Reserve Act of 1913, that it “seemed easier to protect a board from political control than to protect a single appointed official”); Barkow, Insulating Agencies, 89 Tex. L. Rev. at 38 (“[Ojnly one person at the apex can also mean that the agency is more easily captured.”); Robinson, On Reorganizing the Independent Regulatory Agencies, 57 Va. L. Rev. at 962 (“[T]he single administrator may be more vulnerable” to interest group pressures “because he provides a sharper focus for the concentration of special interest power and influence.”).[13] In short, when an independent agency is structured as a multi-member agency rather than as a single-Director agency, the agency can better protect individual liberty because it can better prevent arbitrary enforcement actions and unlawful or otherwise unreasonable rules.[14] B Notably, the multi-member structure of independent agencies is not an accident. On the contrary, Congress has traditionally designed independent agencies as multi-member bodies in order to protect liberty and prevent arbitrary decisionmaking by a single unaccountable Director. As Franklin Roosevelt’s Administration explained in its comprehensive study of independent agencies, the “popular belief that important rule-making functions ought to be performed by a group rather than by a single, officer, by a commission rather than by a department head,” was a reason “for the establishment of independent regulatory agencies.” The President’s Committee on Administrative- Management, Report oe the Committee with Studies op Administrative Management in the Federal Government 216 (1937). In a leading study of independent commissions, a member of the Roosevelt Administration analyzed the creation 'of the Federal Trade Commission and explained: “The two ideas, a commission and independence for the commission, were inextricably bound together. At no point was it proposed that a commission ought to be set up unless it be independent or that an independent officer should be created -rather than a commission.” Robert E. Cushman, The Independent Regulatory Commissions 188 (1941) (emphasis added). Senator Newlands, the sponsor of the legislation creating the' Federal Trade Commission, emphasized the need for a commission rather than a single Director: “If only powers of investigation and publicity are given a single-headed organization, like the Bureau of Corporations, might be the best for the work; but if judgment and discretion are- to be exercised, or if we have in contemplation the exercise of any corrective power hereafter, or if the broad ends above outlined are to be attained, it seems to me that a commission is required.” 51 Cong. Rec. 11,092 (1914). In Humphrey’s Executor, the Supreme Court recognized that Congress intended independent agencies to be multimember bodies. The Court repeatedly noted that the Federal Trade Commission is “a body of experts.” Humphrey’s Executor v. United States, 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). The.Court stated that the nature and functions of the Commission evinced Congress’s “intent to create a body of experts who shall gain experience by length of service—a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government.” Id. at 625-26, 55 S.Ct. 869 (first emphasis added). In short, Congress structured independent agencies as multi-member agencies for good reason—namely, to safeguard individual liberty from the excesses of a single officer’s unaccountable decisionmak-ing. ■ C When examining the relevant history, we can see that the original design, common understanding, and consistent historical-practice of independent agencies as multi-member bodies reflect the larger values of the Constitution. The Constitution as a whole embodies the bedrock principle that dividing power among multiple entities and persons helps protect individual liberty. The Framers created, a federal system with the national power divided among three branches. The Framers “viewed the principle of separation of powers as the absolutely central guarantee of a just Government.” Morrison v. Olson, 487 U.S. 654, 697, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). The principle'of checks and balances influenced how the Framers allocated power within the three national branches. For example, the Framers divided the Legislative Branch into two houses, each with multiple members. No one person operates as Legislator in Chief. Rather, 535 Members of Congress do so, divided into two Houses. Likewise, the Framers established “one supreme Court” composed of multiple “Judges” rather than a single judge. No one person operates as the Supreme Justice. Rather, the Court consists of one Chief Justice and several Associate Justices, all of whom have equal votes on cases. Of course, the one exception to the Constitution’s division of power among multiple parties within the branches is the President, who is the lone- head of the entire Executive Branch. But the President is the exception that proves the rule. For starters, the Framers were concerned that dividing the executive power among multiple individuals would render the Executive Branch too weak as compared to the more formidable Legislative Branch. See The Federalist No. 48 (Madison) (It is “against the enterprising ambition” of the Legislative Branch “that the people ought to indulge all-their jealousy and exhaust all their precautions. The legislative department derives a superiority in our governments ....”). The Framers sought “[e]n-ergy in the executive.” The Federalist No. 70 (Hamilton). . At the same time, the Framers certainly recognized the risk that a single President could lead to tyranny or arbitrary decision-making. To mitigate the • risk to liberty from a single President, the Framers ensured that the President had “a due de.pendence on the people.” Id. The President is nationally elected. In choosing the President, “the-whole Nation has a part, making him the focus of public hopes and expectations.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 653, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Presidential candidates are put through the wringer precisely because of the power they may someday wield. In other words, the Framers concentrated executive power in a single President on the condition that the President would be nationally elected and nationally accountable. The President.is therefore the exception to the ordinary constitutional practice of dividing power among multiple entities and persons. Apart from the President, the Constitution reflects the basic commonsense principle that multi-member bodies—the House, the Senate, the, Supreme Court—do better than single-member bodies in avoiding arbitrary decisionmaking and abuses of power, and thereby protecting individual liberty. That background constitutional principle buttresses the conclusion - that a single-Director independent' agency lies outside the norm and poses a risk to individual liberty. After all, the Director of the CFPB is not elected by the people and is of course not remotely comparable to the President in terms of accountability to the people. And in addition to exercising executive enforcement authority, the Director of the CFPB unilaterally exercises quasi-legislative power, even though that power is ordinarily exercised by multi-member legislative bodies. Moreover, the Director of the CFPB unilaterally exercises appellate quasi-judicial' power, even though that power is ordinarily exercised by multi-member bodies. * * * Justice Kennedy has stated: “Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.” Clinton v. City of New York, 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring). In this case, the CFPB’s novel Single-Director structure departs from history, transgresses the separation of powers, and threatens individual liberty. III. Presidential Authority The single-Director structure of the CFPB not only departs from history and threatens individual liberty. It also diminishes the President’s power to exercise influence over the CFPB, as compared to the President’s power to exercise influence over traditional multi-member independent agencies. That additional diminution of Presidential authority exacerbates the Article II problem posed by the single-Director CFPB. In traditional multi-member agencies, the President may designate the chair of the agency, and the President may remove a chair at will from the chair position. (Of course, the President may not remove that official from the commission or board altogether, only from the position as chair.) By contrast, the CFPB has only one Director, and the President may not designate a new Director until the former Director leaves office or the Director’s term expires. That structure diminishes the President’s power to influence the direction of the CFPB, as compared to the President’s power to influence the direction of traditional multi-member independent agencies. That diminution of Presidential power runs afoul of the Article II principle articulated by the Supreme Court in Free Enterprise Fund. Indeed, this case involves a greater diminution of Presidential power than occurred in Free Enterprise Fund. A As the Supreme Court stated in Free Enterprise Fund, the “landmark case of Myers v. United States reaffirmed the principle that Article II confers on the President the general administrative control of those executing. the laws.” Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 492-93, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). In other words, when it comes to the “responsibility to take care that the laws be faithfully executed,” Article II of the Constitution means that the “buck stops with the President.” Id. at 493, 130 S.Ct. 3138. At the same time, the Free Enterprise Fund Court acknowledged that the general rule of Presidential removal was cabined by the Court’s decision in Humphrey’s Executor. But as the Supreme Court indicated in Free Enterprise Fund, an independent agency’s structure violates Article II when it is not historically rooted and when it causes an additional diminution of Presidential control beyond that caused by a traditional independent agency. See id. at 501, 130 S.Ct. 3138 (“We deal with the unusual situation, never before addressed by the Court, of two layers of for-cause tenure. And though it may be criticized as ‘elementary arithmetical logic,’ two layers are not the same as one.”). The CFPB’s single-Director structure contravenes that diminution principle. As a result of the CFPB’s novel single-Director structure and the five-year fixed term for the Director, a President may be stuck for years—or even for his or her entire four-year term—with a single Director who was appointed by a prior President and who has different policy views. Nothing comparable happens in traditional multi-member independent agencies. Rather, the traditional multi-member structure ordinarily allows the current President to exercise some influence over the agency through Presidential appointment. That is because the President may designate agency chairs and may remove agency chairs at will from their positions as chairs.[15] The power to designate and remove chairs at will is important because, by statute, the “chairs of multimember agencies have been granted budget, personnel, and agenda control.” Kirti Datla & Richard L. Revesz, Deconstructing Independent Agencies (and Executive Agencies), 98 Cornell L. Rev. 769, 818 (2013). “In many agencies, the chair has the right to appoint staff directly and is the public voice of the agency. These powers allow the chair to exercise significant control over the agency’s agenda.” Rachel E. Bar-kow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15, 39 (2010). Professor Revesz is one of the Nation’s leading scholars of the administrative state. He and Kirti Datla have succinctly summarized the President’s authority with respect to chairs: The chair of a multimember agency usually holds the position of chair—but not as a member of the agency—at the will of the President. After removal of an existing chair, the President can then appoint a new chair with preferences closer to his. The ability of the President to retain policy influence through the selection of the chair is important because ... the chair of a multimember agency is ordinarily its most dominant figure. While there is room for debate, it is dear that the ability to appoint the head of an independent agency allows the President to retain some control over that agency’s activities. An appointed chair will align with the President for multiple reasons. Datla & Revesz, Deconstructing Independent Agencies, 98 Cornell L. Rev. at 819 (internal quotation marks omitted) (emphases added); see also Glen O. Robinson, Independent Agencies: Form and Substance in Executive Prerogative, 1988 Duke L.J. 238, 245 n.24 (1988) (“It is important to note that since Humphrey’s Executor the President generally has been given power to designate agency chairmen. ... From personal experience I can report that the FCC’s chairman and a handful of staff—usually selected by the chair—can and usually do exercise nearly total control over, that agency’s basic policy agenda.”). To-be sure, the chair alone ordinarily-may-not affirmatively issue rules, initiate enforcement actions, or adjudicate disputes. But the chair both controls the agenda and may prevent certain- actions from occurring. So the President’s ability to designate a chair is valuable, even in circumstances where the agency as a whole continues to be controlled by commissioners or board members who might oppose the President’s views. By exercising their power to appoint chairs of the major multi-member independent agencies, Presidents may gain some control over the direction of those agencies within days of taking office at the start of their first terms. For example, President Trump replaced the chairs of the FTC, FCC, SEC, and NLRB within one week of taking office in January 2017. President Obama did the same by March 2009. But a President has no such power when it comes to the single Director of the CFPB, who serves a fixed five-year term. Unlike with the FTC, FCC, SEC, and NLRB, for example, the President -was not able to desígnate a new Director of the CFPB in January 2017. That problem will only grow worse for the next few Presidents. The most recent CFPB Director left .office in November 2017. Assuming for present purposes that a new Director is appointed in 2018 for a five-year term, that Director may serve until 2023—several years after the 2020 election. The President who is elected (or re-elected) in 2020 will have no power to remove that Director until 2023, some two or three years into that Presidential term. A new Director then will be appointed in 2023. That Director could serve until 2028—nearly the entire term of the President elected in 2024. Another new Director may be appointed in 2028. That Director could serve until 2033, meaning for the entirety of the term of the President elected in 2028. Those very realistic scenarios expose the CFPB’s flagrant disregard of constitutional text, history, structure, and precedent (not to mention, common sense). And those scenarios convincingly demonstrate that the single-Director CFPB, with its fixed five-year Director term, causes a diminution of Presidential power greater than the diminution that occurs in traditional multi-member independent agencies. There is more. In a multi-member agency, the commissioners or board members other than the chair serve staggered terms and are replaced by the President as their terms expire. A tradition has developed by which some commissioners or board members of the opposite party resign from independent agencies when a new President takes office. See Datla & Revesz, Deconstructing Independent Agencies, 98 Cornell L. Rev. at 820-21. Even apart from that tradition, the staggered terns mean that a President will have ever-increasing influence (through appointments) over an independent agency during the course of that President’s term. That does not occur with thé single-Director CFPB. Until the Director’s term expires, the new President has zero influence through appointment, and the zero remains zero until the Director’s term expires. Although this line of reasoning “may be criticized as elementary arithmetical logic,” some influence exceeds zero influence. Free Enterprise Fund, 561 U.S. at 501, 130 S.Ct. 3138. This is a much starker case of unconsti-tutioriality than Free Enterprise Fund. In Free Enterprise Fund, the second for-cause provision did not afford PCAOB members all that much additional insulation from the President. The case therefore involved an important but marginal additional diminution of Presidential authority beyond the diminution that occurs in a traditional independent agency. Here, by contrast, Presidents will be stuck for years at a time with CFPB .Directors appointed by prior Presidents. This case therefore involves a substantial additional diminution of Presidential authority beyond the diminution that occurs in a traditional independent agency. The additional diminution exacerbates the Article.. II problem posed by the single-Direetor CFPB. B The CFPB says that a single head of an independent agency might be mare responsive on an ongoing basis to the President than multiple heads of an independent agency are, thereby mitigating the Article II concern with a single-Direetor independent agency. That argument is wrong, both as a matter of theory and as a matter of fact. To begin with, whether headed by one, three, or five members, an' independent agency’s heads are not removable at will by the President. With independent agencies, the. President is limited (after designation of . the chair and appointment of new members) in essence to indirect cajoling. Cf. Elena Kagan, Presidential Administration, 114. Harv. L. Rev. 2245, 2323 (2001) (“[A] for-cause removal provision would buy little substantive independence if the President, though unable to fire an official, could command or, if necessary, supplant his every decision.”).[16] .As Justice Scalia once memorably noted, an attempt by the President to supervise, direct, or threaten to remove the head of an independent agency with respect to a particular substantive decision is statutorily impermissible and likely to trigger “an impeachment motion in Congress.” Tr. of Oral Arg. at 60, Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). That is true whether there are one, three, or five heads of the independent agency. The independent status of an independent agency erects a high barrier between the President and the independent agency, regardless of how many people head the independent agency on the other side of the barrier.- Moreover, even assuming that ongoing influence of independent agencies can occur in indirect ways, it is not plausible to say that a President could have more indirect ongoing influence over (i) a single Director who has policy views contrary to the President’s than the President has over (ii) a multi-member independent agency headed by a chair who is appointed by the President and shares the same policy views as the President. In short, given the President’s inability to designate a new CFPB Director at the ■beginning of the Presidency—in contrast to the President’s ability to appoint chairs of the FTC, FCC, SEC, and NLRB, for example—the single-Director CFPB structure diminishes the President’s power more than the traditional multi-member independent agency does.[17] The CFPB also says that Congress’s creation of the single-Director structure is unlikely to afford Congress any greater influencé over the CFPB than Congress has over a multimember independent agency. Perhaps true, perhaps not. Either way, however, the Supreme Court has stressed that congressional aggrandizement is not a necessary feature of an Article II violation in this context. The Court squarely said as much in Free Enterprise Fund. “Even when a branch does not arrogate power to itself, therefore, it must not impair another in the performance of its constitutional duties.” 561 U.S. at 500, 130 S.Ct. 3138. And to take an obvious example of the point, if Congress enacted legislation converting the Department of Justice into an independent agency, there would be no formal congressional aggrandizement. But there is 'little doubt that-such legislation would violate Article II. See Morrison v. Olson, 487 U.S. 654, 695-96, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). In considering the Presidential power point, keep in mind that the CFPB repeatedly compares itself to the FTC. That comparison is wrong as a matter of history and liberty, as discussed above. But the comparison is also wrong as a matter of Presidential authority. When the three-judge panel first heard this case in 2016, some of the threats to Presidential power may have appeared theoretical. In 2017, those threats became much more'concrete. In January 2017, the President designated new Chairs of the FTC, FCC, SEC, and NLRB, among other multi-member independent agencies. Meanwhile, the President was legally unable to designate a new CFPB Director. The President’s inability to do so led to a variety of episodes throughout 2017 that highlighted the diminution of Presidential power over the CFPB, as compared to the President’s power over the traditional multi-member independent agencies. For example, during 2017, the Director of the CFPB took several major actions contrary to the President’s policy views. In the wake of the CFPB’s activities over the past year, the question that the Supreme Court asked in Free Enterprise Fund is right on point: “where, in all this, is the role for oversight by an elected President?” 561 U.S. at 499, 130 S.Ct. 3138. By disabling the President from supervising and directing the Director of the CFPB, the Dodd-Frank Act contravenes the Supreme Court’s statement in Free Enterprise Fund,: “Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.” Id. at 502,130 S.Ct. 3138. In sum, the novel single-Director structure of the CFPB diminishes Presidential authority more than the traditional multi-member agencies do. That diminution of Presidential authority exacerbates the Article II problem with the single-Director CFPB. C The CFPB’s departure from historical practice, threat to individual liberty, and diminution of Presidential authority combine to make this an overwhelming case of unconstitutionality. But suppose that there were no additional diminution of Presidential authority caused by the single-Director structure of the CFPB, beyond that which occurs with traditional multimember independent agencies. Would the single-Director structure still be unconstitutional? The answer is yes. Neither Humphrey’s Executor nor any later case has granted Congress a free pass, without boundaries, to create independent agencies that depart from history and threaten individual liberty. Humphrey’s Executor is not a blank check for Congress. Humphrey’s Executor does not mean that anything goes. In that respect, keep in mind (in case I have not mentioned it enough already) that the Constitution’s separation of powers is not solely or even primarily concerned with preserving the powers of the branches. The separation of powers is primarily designed to protect individual liberty. As I have explained, the single-Director CFPB departs from settled historical practice and threatens individual liberty far more than a multi-member independent agency does. The single-Director CFPB therefore poses a constitutional problem even if (counter-factually) it does not occasion any additional diminution of Presidential power beyond that caused by traditional multi-member independent agencies. IV. Vertical Stare Decisis and Judicial Deference Notwithstanding all of the above, the CFPB argues that, as a matter of vertical stare decisis, this case is controlled by (i) Humphrey’s Executor, (ii) Morrison; or (iii) general principles of judicial deference. The CFPB is incorrect. First, the CFPB contends that Humphrey’s Executor controls this case—in other words, that Humphrey’s Executor by its terms upheld all independent agencies, including single-Director independent agencies. That is wrong. In Humphrey’s Executor, the Supreme Court did not say (or articulate a principle) that single-Director independent agencies are constitutional. Not even close. After all, Humphrey’s representative argued to the Supreme Court that the “nature” of the Federal Trade Commission justified independence from the President: “With the increasing complexity of human activities many situations arise where governmental control can be secured only by the ‘board’ or ‘commission’ form of legislation.” Brief for Samuel F. Rathbun, Executor, at 41, Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (citation and internal quotation marks omitted). In its opinion, the Court agreed. The Court noted that the Federal Trade Commission “is to be non-partisan” and, like the Interstate Commerce Commission, be composed of members “called upon to exercise the trained judgment of a body of experts.” Humphrey’s Executor, 295 U.S. at 624, 55 S.Ct. 869. The Court stated that the nature and functions of the FTC evinced Congress’s “intent to create a body of experts who shall gain experience by length of service—a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government.” Id. at 625-26, 56 S.Ct. 869 (emphasis omitted). The CFPB responds, that the Humphrey’s Executor Court’s multiple references to a “body of experts” were not relevant to the Court’s constitutional holding. That is incorrect. The Court repeatedly referenced the Federal Trade Commission’s status as a body of experts in concluding that Congress could permissibly insulate- the - FTC commissioners from Presidential removal. The Court wrote: “The Federal- Trade Commission- is an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid.” Id. at 628, 55 S.Ct. 869. “Such a body,” according to the Court, “cannot in any proper sense be characterized as an arm or an eye of the executive,” and thus such a body can be made independent of the President. Id. In short, Humphrey’s Executor repeatedly emphasized the multi-member structure of the FTC. In doing so, Humphrey’s Execivtor drew (at least implicitly) the same distinction between multi-mem-ber agencies and single-Director agencies that I am drawing in this case. At best for the CFPB, Humphrey’s Executor leaves open the single-Director question. Humphrey’s Executor does not hold that single-Director independent agencies are constitutional.[18] Second, the .CFPB argues that Morrison v. Olson controls this case. That suggestion is even, further afield. Morrison upheld the independent counsel law. But the independent counsel differed in three critical ways from the ordinary independent agency. The independent counsel had only a narrowly defined jurisdiction in cases where the Department of Justice had a conflict of interest. The independent counsel had only enforcement authority, not rulemaking or adjudicative authority. And the independent counsel was an inferior officer, not a principal officer (a point the Supreme Court emphasized in Free Enterprise Fund). The independent' counsel was an inferior officer,- the Morrison Court said, because she could be supervised and directed by the Attorney General. Morrison did not hold—or even hint—that a single principal officer could be the sole head of an independent regulatory agency with broad enforcement, rulemaking, and adjudication powers. Moreover, no party in Morrison argued that the Office of the Independent Counsel was unconstitutional because a single person headed it. Arid it is black-letter law that cases are not precedent for issues that were not raised or decided. See Bryan A. Garner et al„ the Law of Judicial Precedent 46, 84, '226-28 (2016). For that reason, too, it is impossible to rely on the result in Morrison as a binding precedent on the single-Director question. The' CFPB separately argues that the so-called Morrison “test”—as distinct from Morrison’s result—dictates a particular conclusion in this case. In Morrison, the Court said that removal restrictions could not be “of such a nature that they impede the President’s ability to perform his constitutional’ duty.” Morrison v. Olson, 487 U.S. 654, 691, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). As relevant here, Morrison and Free Enterprise Fund together mean that Congress' may not diminish Presidential control over independent agencies more than the dimiriution that occurs with traditional multi-member agéncies. As, explained above, the single-Director independent agency structure does diminish Presidential authority more than traditional multi-member independent agencies do. So the CFPB flunks the Morrison and Free Enterprise Fund test. Even if that were not the case, however, the Morrison “test” is not the exclusive way that a novel independent agency structure may violate Article II. Neither Humphrey’s Executor nor any later case gives Congress blanket permission to create independent agencies that depart from history and threaten individual liberty. In that regard, I repeat what I wrote 10 years ago -in Free Enterprise Fund: [T]he lengthy recitation of text, original understanding, history, and precedent above leads to the following principle: Humphrey’s Executor and Morrison represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President’s removal power. Therefore, given a choice between drawing the line at the holdings in Humphrey’s Executor and Morrison or extending those cases to authorize novel structures such as the POAOB that further attenuate the President’s control over executive officers, we should opt for the former. We should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history. ... In this case, that sensible principle dictates that we hold the line and not allow encroachments on the President’s removal power beyond what Humphrey’s Executor and Morrison already permit. Free Enterprise Fund v. Public Company Accounting Oversight Board, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). Third, in addition to invoking Humphrey’s Executor and Morrison, the CFPB and its amici cite various arguments for judicial deference to Congress’s choice of a single-Director structure. Those scatter-shot arguments are all unavailing. Some speak of the CFPB as a one-off congressional experiment (like the independent counsel law) and suggest that we should let it go as a matter of judicial deference to Congress. But even apart from the fundamental point that our job as judges is to enforce the law, not abdicate to the political branches, cf. Boumediene v. Bush, 553 U.S. 723, 765-66, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), we cannot think of this as a one-off case because we could not cabin the consequences in any principled manner if we were to uphold the CFPB’s single-Director structure. As the Supreme Court has warned: “Slight encroachments create new boundaries from which legions of power can seek new territory to capture.” Stern v. Marshall, 564 U.S. 462, 503, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Justice Frankfurter captured it well in his opinion in Youngstown: “The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). That fairly describes what a ruling upholding the CFPB’s single-Director structure would mean. As the CFPB acknowledged at oral argument before the three-judge panel, a ruling in its favor would necessarily allow all extant independent agencies to be headed by one person. The CFPB’s position, if accepted, would give Congress the green light to convert other heads of independent agencies into single Directors rather than multi-member commissions. A single-Director SEC, with the power to unilaterally impose $500 million penalties? A single-Director FCC, with the power to unilaterally mandate or rescind “net neutrality”? A single-Director NLRB, with the power to unilaterally supervise employer-employee relations nationwide? A single-Director Federal Reserve, with the power to unilaterally set monetary policy for the United States? That’s what the CFPB’s position would usher in. “In the past, when faced with novel creations of this sort, the Supreme Court has looked down the slippery slope—and has ordinarily refused to take even a few steps down the hill.” Free Enterprise Fund, 537 F.3d at 700 (Kavanaugh, J., dissenting). We should heed that caution and not start down the hill in this case. More broadly, some suggest that judges should generally defer to Congress’s understanding of the Constitution’s separation of powers. But that hands-off attitude would flout a long, long line of Supreme Court precedent. See Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 508, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (invalidating structure of Public Company Accounting Oversight Board); Boumediene, 553 U.S. at 765-66, 792, 128 S.Ct. 2229 (invalidating provision of Military Commissions Act); Clinton v. City of New York, 524 U.S. 417, 448-49, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (invalidating Line Item Veto Act); Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252, 265-77, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991) (invalidating structure of Metropolitan Washington Airports Authority Board of Review); Bowsher v. Synar, 478 U.S. 714, 733-34, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (invalidating Comptroller General’s powers under reporting provisions of Balanced Budget and Emergency Deficit Control Act); INS v. Chadha, 462 U.S. 919, 942 n.13, 957-59, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (invalidating legislative veto provision of Immigration and Nationality Act); Buckley v. Valeo, 424 U.S. 1, 134-35, 140, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (invalidating structure of Federal Election Commission); Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (invalidating provision requiring Senate consent to President’s removal of executive officer). Citing the fact that President Obama signed the Dodd-Frank Act that created the CFPB, some argue that the Executive Branch has somehow waived any objection to this Article II violation. But President George W. Bush signed the Sarbanes-Ox-ley Act that created the PCAOB. That fact did not deter the Supreme Court in Free Enterprise Fund. The Court firmly declared that “the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment.” Free Enterprise Fund, 561 U.S. at 497, 130 S.Ct. 3138. A President cannot “choose to bind his successors by diminishing their powers.” Id. Some argue that the courts need not intervene to address the CFPB’s structural flaw because the CFPB is checked by Congress through Congress’s oversight power and ultimate control over appropriations. But Congress cannot supervise or direct the Director on an ongoing basis regarding what rules to issue, what enforcement actions to bring (or decline to bring), or how to resolve adjudications.[19] In urging judicial deference to the single-Director structure, the CFPB also points out that the CFPB’s decisions are checked by the courts, so we should not worry too much about the CFPB's single-Director structure.' But much of what an agency does—determining what rules to issue within a broad statutory authorization and when, how, and against whom to bring enforcement actions to enforce the law—occurs in the twilight of discretion. Those discretionary actions have a critical impact on individual liberty. Yet courts do not review or only deferentially review such exercises of agency discretion. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 41-43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Heckler v. Chaney, 470 U.S. 821, 831-33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The probability of judicial review of some agency action has never excused or mitigated an Article II problem in the structure .of the agency. See, e.g., Free Enterprise Fund, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706; Buckley, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659. * * * In ■ sum', the CFPB’s single-Director structure departs from settled historical practice, threatens individual liberty, and diminishes the President’s Article II authority to exercise the executive power. Applying the Supreme Court’s separation of powers precedents, I conclude that the CFPB is unconstitutionally structured because it is an independent agency that exercises substantial executive power and is headed by a single Director. Y. "Remedy .Having concluded that the CFPB is unconstitutionally structured, I reach the question of,the appropriate remedy. In light of this one specific constitutional flaw in the Dodd-Frank Act, must that whole Act be struck down? Or must' we strike down at least those statutory provisions creating the CFPB and defining the CFPB’s duties and authorities? Or do we more narrowly strike down and sever the for-cause removal provision that is. the source of the constitutional problem? Not surprisingly, PHH wants us, at a minimum, to strike down the CFPB ■ and prevent its continued operation. The United States as amicus curiae agrees with PHH on the merits, but disagrees on the remedy. According to the United States, the Supreme Court’s case law requires iis to impose the narrower remedy of simply severing the for-cause removal provision. I agree with the United States’ reading of the Supreme Court precedent. In Free Enterprise Fund, the Supreme Court confronted a similar issue with respect to the Public Company Accounting Oversight Board. Having found that Board’s Structure unconstitutional, would the Court invalidate the agency (or even the whole Sarbanes-Oxley Act) or simply sever the for-cause provision? The Court stated: “Generally, speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.” Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 508, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Applying that principle, the Free Enterprise Fund Court severed the second for-cause provision and otherwise left the PCAOB intact. Severability is appropriate, the Free Enterprise Fund Court stated, so .long as (i) Congress would have preferred the law with the offending provision severed over no law at all; and (ii) the law with the offending provision severed would remain “fully operative as a law.” Id. at 509, 130 S.Ct. 3138. Both requirements are met here. ■ First, in considering Congress’s intent with respect to severability, courts must decide—or often speculate, truth be told— whether Congress would “have preferred what is left of its statute to no statute at all.” Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 320, 330, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006); see also Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685, 107 S.Ct. 1476, 94 L.Ed;2d 661 (1987) (The “unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.”). Importantly, courts need not speculate and can presume that Congress wanted to retain the constitutional remainder of the statute when “Congress has explicitly provided for severance by including a severability clause in the statute.” Id. at 686,107 S.Ct. 1476; see a.lso id. (The “inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision.”). The statute at issue in Free Enterprise Fund had no express severability clause. By contrast, in this case, the Dodd-Frank Act contains an express severability clause that instructs: “If. any provision” of the Act “is held to be unconstitutional, the remainder of’ the Act “shall not be affected thereby.” 12 U.S-.C. § 5302. This case therefore presents an even easier case than Free Enterprise Fund for severability of the for-cause provision: Through • its express severability clause, the Dodd-Frank Act itself all but answers the question of presumed congressional intent. It will be the rare case when a court may-ignore a severability, provision set forth in the text of the relevant statute. See Alaska Airlines, 480 U.S. at 686, 107 S.Ct. 1476. I see no justification for tilting at- that windmill in this case. Second, we also must look at “the balance of the legislation” to assess whether the statute is capable “of functioning” without the offending provisions “in a manner consistent with the intent of Congress.” Id. at 684-85, 107 S.Ct. 1476 (emphasis omitted); That prong of the analysis in essence turns on whether the truncated statute is “fully operative as a law.” Free Enterprise Fund, 561 U.S. at 509, 130 S.Ct. 3138; To take just one example, in Marburg v. Madison, the Court concluded that Section 13 of the Judiciary Act of 1789 was unconstitutional in part. 5 U.S. (1 Cranch) 137, 179-80, 2 L.Ed. 60 (1803). But the Court did not disturb the remainder of the Judiciary Act. Id. at 179-80. Here, as in Free Enterprise Fund, the Dodd-Frank Act and its CFPB-related provisions will remain “fully operative as a law” without the for-cause removal restriction. Free Enterprise Fund, 561 U.S. at 509, 130 S.Ct. 3138. Operating without the for-cause removal provision and under the supervision and direction of the President, the CFPB may still “regulate the offering and provision of consumer financial products or services under- the Federal consumer-financial laws,” 12 U.S.C. § 5491(a), much as the Public Company Accounting Oversight Board .has continued fulfilling its statutorily authorized mission in the wake of the Supreme Court’s decision in Free Enterprise Fund.[20] Moreover, the CFPB’s operation as an executive agency will not in any way prevent the overall Dodd-Frank Act from operating as a law. To be sure, one might ask whether, instead of severing the for-cause removal provision, which would make the CFPB an executive agency, we should rewrite and add to the Dodd-Frank Act by restructuring the CFPB as a multi-member independent agency. But doing so would require us to create a variety of new offices, designate one of the offices as chair, and specify various administrative details of the reconstituted agency. In Free Enterprise Fund, the Supreme Court firmly, rejected that approach. As the Supreme Court said, all of that “editorial freedom” would take courts far beyond our judicial capacity and proper judicial role. 561 U.S. at 510, 130 S.Ct. 3138. In comparable circumstances, no Supreme Court case has adopted such an approach. We therefore may not do so here. Congress of course remains free, if it wishes, to reconstruct the CFPB as a tra: ditional multi-member independent agency. In similar circumstances, the Supreme Court in Free Enterprise Fund severed the unconstitutional for-cause provision but did.not otherwise disturb the Sar-banes-Oxley Act or the operation of the new Public Company Accounting Oversight Board created by that Act. See id. at 508-10, 130 S.Ct. 3138. Similarly, in a recent case involving the Copyright Royalty. Board, we severed the for-cause provision that rendered that Board unconstitutional, but did not otherwise disturb the copyright laws or the operation of the Copyright Royalty Board. See Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012). In light of the Dodd-Frank Act’s express severability clause, and because the Act and the CFPB may function without the CFPB’s for-cause removal provision, we must remedy the constitutional violation by severing the for-cause removal provision from the statute. Under that approach, the CFPB would continue to operate, but would do so as an executive agency. The President of the United States would have the power to supervise and direct the Director of the CFPB, and to remove the Director at will at any time. * * * The CFPB violates Article II of the Constitution because the CFPB is an independent agency that exercises substantial executive power and is headed by a single Director. We should invalidate and sever the for-cause removal provision and hold that the Director of the CFPB may be supervised, directed, and removed at will by the President. I respectfully dissent. . Because the Social Security Administration and the Office of Special Counsel do not exercise the core executive power of bringing law enforcement actions and because they have narrow jurisdiction, a holding invalidating the single-Director structure of the CFPB would not necessarily invalidate the single-Director structure of the Social Security Administration and the Office of Special Counsel. That said, if those two, agencies are unconstitution•ally structured, the remedy would presumably be the same remedy as in Free- Enterprise Fund', severing the for-cause provision so that the agencies would continue to fully operate, albeit as traditional executive agencies rather than independent agencies. I do not address those agencies in this case. . Recall, moreover, that the independent counsel experiment ended with nearly universal consensus that the experiment had been a mistake and that Justice Scalia had been right back in 1988 to view the independent counsel system as an unwise and unconstitutional departure from historical practice and a serious threat to individual liberty. See Morrison v. Olson, 487 U.S. 654, 699, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting) ("this wolf comes as a wolf”); see also Stanford Lawyer 4 (Spring 2015) (quoting Justice Kagan’s statement that Justice Scalia’s dissent in Morrison is "one of the greatest dissents ever written and every year it gets better”). The independent counsel experience strongly counsels against single-Director independent agencies. The independent counsel is, of course, distinct from the traditional special counsels who are appointed by the Attorney General for particular matters. Those special counsels ordinarily report to and are removable by the Attorney General or the Deputy Attorney General. In this section of the opinion, I am addressing the historical practice of how independent agencies are structured. A separate question is whether Morrison v. Olson constitutes a judicial precedent on the question of whether a single-Director independent regulatory agency is constitutional. The answer to that question is also no, for similar reasons. I will address the Morrison point more fully in Part IV below. . Some have suggested that the CFPB Director is similar to the Comptroller of the Currency. But unlike the Director, the Comptroller is not independent. The Comptroller is removable at will by the President. Full stop. See 12 U.S.C. § 2 (“The Comptroller of the Currency shall be appointed by the President, by and with the advice and consent of the Senate, and shall hold his office for a term of five years unless sooner removed by the President, upon reasons to be communicated by him to the Senate.”). A predecessor Comptroller of- the Treasury, established in 1789, likewise was not independent. In Free Enterprise Fund, the Supreme Court definitively explained that the original Comptroller of the Treasury was removable at will by the President. See 561 U.S. at 500 n.6, 130 -S.Ct. 3138. The Free Bnterprise Fund opinion also addressed the alleged attribution to Madison of "a belief that some executive officers, such as the Comptroller, could be made independent of the President.”. Id. The Free Enterprise Fund' Court explained that “Madison’s actual proposal, consistent with his view of the. Constitution, was that the Comptroller hold office for a term of ‘years, unless sooner removed by the President ....’” Id. (quoting 1 Annals of Congress 612 (1789)) (emphasis added). . Congress may of course establish executive ■ agencies that are headed by multiple individuals (although Congress rarely does so), but each agency head must be removable at will by the President in order for the agency to maintain its status as an executive agency. . The settled historical practice is further illustrated by the quorum provisions applicable to independent agencies. Those quorum pro- . visions reinforce the accepted understanding that independent agencies must have multiple commissioners or board members. Cf. New Process Steel, L.P. v. NLRB, 560 U.S. 674, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010); Marshall J. Breger & Gary J. Edles, Established by Practice: The Theory and Operation of Independent Federal Agencies, 52 Admin. L. Rev. 1111, 1182-83 , & app. (2000) (summarizing independent agency quorum requirements). . As a matter of first principles, there would be a strong argument that this case could and should be resolved - in PHH’s favor by the constitutional text alone—on the ground that independent agencies violate Article II. But Humphrey’s Executor rejected that broad argument, and we as a lower court are bound by that case. The question -for us is whether Humphrey’s Executor extends to Single-Director independent agencies. . The Supreme Court has relied heavily on historical practice not just in separation of powers cases, but also in federalism cases. In several federalism cases over the last 25 years, the Court has invalidated novel congressional statutes that altered the traditional federal-state balance. See New York v. United States, 505 U.S. 144, 177, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("The take title provision appears to be unique. No other federal statute has been cited which offers a state government no option other than that of implementing legislation enacted by Congress.”); Printz v. United States, 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (“[I]f, as petitioners contend, earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist.”); Alden v. Maine, 527 U.S. 706, 744, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("The provisions of the FLSA at issue here, which were enacted in the aftermath of Parden, are among the first statutory enactments purporting in express terms to subject nonconsenting States to private suits.”); cf. National Federation of Independent Business v. Sebelius, 567 U.S. 519, 549, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (binding opinion of Roberts, C.J.) ("But Congress has never attempted to rely on that power to compel individuals not engaged in commerce to purchase an unwanted product.”); id. at 659, 132 S.Ct. 2566 (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.) ("[T]he relevant history is not that Congress has achieved wide and wonderful results through the proper exercise of its assigned powers in the past, but that it has never before used the Commerce Clause to compel entry into commerce.”). . Of course, if the constitutional text is sufficiently clear, then the existence of any historical practice departing from that text is not persuasive. See, e.g., INS v. Chadha, 462 U.S. 919, 944-46, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); Powell v. McCormack, 395 U.S. 486, 546-47, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). . Justice Breyer dissented for four Justices in Free Enterprise Fund. But importantly, he ‘ dissented not because he disagreed With the Court’s point that historical practice matters, but rather primarily because he did not see a meaningful difference—in practical, analytical, or constitutional terms—between one level and two levels of for-cause removal. See Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 525-26, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (Breyer, J., dissenting). . Justice Scalia concurred in the judgment for four Justices in Noel Canning, arguing as relevant here that the text of the Constitution rendered intra-session recess appointments unconstitutional even in Senate recesses of 10 or more days. But Justice Scalia did not disagree with the Court’s claim that historical practice often matters in separation of powers cases involving ambiguous constitutional text, which is the relevant point for our purposes. See NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 2594, slip op. at 5, 189 L.Ed.2d 538 (2014) (Scalia, J., concurring in judgment) ("Of course, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.”). Rather, Justice Scalia stated that the constitutional text in that case was sufficiently clear and disposi-tive that resort to historical practice was unnecessary' and unwarranted. See id. at 2592, slip op, at 2; see generally John F. Manning, Separation of Powers as Ordinary Interpretation, 124 Harv. L. Rev. 1939 (2011). . By statute, certain independent agencies must include members of both major political parties. See, e.g., 15 U.S.C. § 41 (Federal Trade Commission); 15 U.S.C. § 78d(a) (Securities and Exchange Commission); 15 U.S.C. § 2053(c) (Consumer Product Safety Commission); 42 U.S.C. § 7171(b)(1) (Federal Energy Regulatory Commission). Most others are bipartisan by tradition. . This case exemplifies the reality of (and not just the potential for) arbitrary decision-making by the Director of the CFPB. The Director discarded the Government's longstanding interpretation of the relevant statute, adopted a new interpretation of that statute, applied that new interpretation retroactively, and then imposed massive sanctions on PHH for violation of the . statute—even though PHH's relevant acts occurred before the Director changed his interpretation of the statute. Cf. Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly.”). Notably, the Director unilaterally added $103 million to the $6 million in penalties that had been imposed by the administrative law judge. . To be sure, multi-member independent agencies are hardly perfect. For example, some members of multi-member independent agencies may occasionally move in lockstep, thereby diminishing the benefits of multi- ■ member bodies. Moreover, it can be harder to find three or five highly qualified commission- • ers than just one highly qualified commission- - er. And multi-member bodies are often not as efficient as single-headed agencies and can be beset by contentious relations among the members; That said, "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government.” Bowsher v. Synar, 478 U.S. 714, 736, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Indeed, so as to avoid falling back into the kind of tyranny that they had declared independence from, the Framers often made trade-offs against efficiency in the interest of enhancing liberty. . For example, the President unilaterally designates (and may unilaterally remove at will from the position as chair) jhe chairs of the following agencies: the Defense Nuclear Facilities Safety Board, 42 U.S.C. § 2286(c)(1); the Federal Communications Commission, 47 U.S.C. § 154(a); the Federal Energy Regulatory Commission, 42 U.S.C. § 7171(b)(1); the Federal Maritime Commission, 46 U.S.C. § 301(c)(1); the Federal Labor Relations Authority, 5 U.S.C. § 7104(b); the Federal Trade Commission, 15 U.S.C. § 41; the Federal Mine Safety and Health Review Commission, 30 U.S.C. § 823(a); the National Labor Relations Board, 29 U.S.C. § 153(a); the Nuclear Regulatory Commission, 42 U.S.C. § 5841(a); the Occupational Safety and Health- Review Commission, 29 U.S.C. § 661(a); the Postal Regulatory Commission, 39 U.S.C. § 502(d); the Securities and Exchange Commission, 15 U.S.C. § 78d note; and the Surface Transportation Board, 49 U.S.C. § 1301(c). . The for-cause .removal restrictions attached to independent agencies ordinarily prohibit removal except in cases of inefficiency, neglect of duty, or malfeasance, Those restrictions have significant impact both in law and in practice. See Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 502, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (for-cause restrictions "mean what they say”). Humphrey’s Executor and Wiener v. United States show, for example, that for-cause removal requirements prohibit dismissal by the President due to lack of trust in the administrator,'see Humphrey’s Executor v. United States, 295 U.S. 602, 618-19, 625-26, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), differences in policy outlook, id., or the mere desire to install administrators of the President’s choosing, Wiener v. United States, 357 U.S. 349, 356, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). To cabin the effects of Humphrey's Executor on the Presidency, some have proposed reading the standard for-cause removal restrictions in the statutes creating independent agencies to allow for Presidential removal of independent agency heads based on policy differences, But ás the Supreme Court -recently explained, Humphrey’s Executor refuted the idea that ■' "simple disagreement” with an agency head’s "policies or priorities could constitute ‘good cause’ for its removal.’-’ Free Enterprise Fund, 561 U.S. at 502, 130 S.Ct. 3138. The Free Enterprise Fund Court' 'expressly confirmed that Humphrey’s Executor "rejected a removal premised on-a lack of agreement on either the policies or the administering of the Federal Trade Commission." Id. . The CFPB says that the Chair of the Federal Reserve Board is not removable at will from the chair position. That is not apparent from the statutory language. Cf. infra note 20; see also Adrian Vermeule, Conventions of Agency Independence, 113 Colum. L. Rev, 1163, 1196 (2013) (While "the members of the Federal Reserve Board enjoy statutory for-cause protection, the Chair and Vice Chairs-do not, qua Chairs.”). But even assuming the CFPB’s assertion is correct,- such an exception would simply reflect the unique function of the Federal Reserve Board with respect to monetary policy. The Chair of the Federal Reserve Board would be akin to - what Justice Breyer in Noel Canning referred to as an historical anomaly—here, an anomaly due to the Federal Reserve’s special functions in setting monetary policy and stabilizing the financial markets. The Federal Reserve Board is certainly not a model or precedent for wholesale creation of a vast independent regulatory state run by single-Director independent agencies that oppose a particular President. If the CFPB is right in this case, Congress could create an independent Federal Reserve headed by one Director. The CFPB apparently thinks that would be fine. I disagree. Indeed, that question should not be a close call. Apart from the Federal Reserve Board, there áre a few other relatively minor examples- where the President arguably may not have the ability to designate and remove chairs at will. But as discussed .above, there can be no doubt that the common practice in traditional independent agencies is that the President may designate a chair and remove a chair at will. . In its brief, PHH has expressly preserved the argument that Humphrey's Executor should be overruled. The reasoning of Humphrey's Executor is inconsistent with the reasoning in the Court’s prior decision in Myers. See Humphrey’s Executor v. United States, 295 U.S, 602, 626, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) ("In so far as” the expressions in Myers are "out of harmony with the views here set forth, these expressions are disapproved.”). The Humphrey’s Executor decision subsequently has received significant criticism. See Geoffrey P. Miller, Independent Agencies, 1986 Sup. Ct. Rev. 41, 93 ("Humphrey's Executor, as commentators have noted, is one of the more egregious opinions to be found on pages of the United States Supreme Court Reports.”); Peter L, Strauss, The Place of Agencies in Government: Separation of Powers and the Fourth Branch, 84 Colum. L. Rev. 573, 611-12 (1984) ("Remarkably, the Court did not pause to examine how a purpose to create a body 'subject only to the people of the United States’—that is, apparently, beyond control of the constitutionally defined branches of government—could itself be sustained under the Constitution.”). Moreover, the reasoning of Humphrey’s Executor is in tension with the reasoning of the Supreme Court’s recent. decision in Free Enterprise Fund.. See In re Aiken County, 645 F.3d 428, 444-46 (D.C. Cir. 2011) (Kavanaugh, J., concurring); Neomi Rao, Removal: Necessary and Sufficient for Presidential Control, 65 Ala. L. Rev. 1205', 1208 (2014). For those reasons, among others, PHH preserves the argument that Humphrey’s Executor should be overruled by the Supreme 'Court. Overruling .Humphrey’s Executor would not mean the end of the agencies that áre now independent. The agencies would instead transform into executive agencies supervised and directed by the President. So the question is not the existence of the agencies; the question is the President's control over the agencies and the resulting accountability of those agencies to the people. In any event, it is -not our job to decide whether to overrule Humphrey’s Executor. As a lower court, we must follow Supreme Court precedent, ‘including Humphrey’s Executor. But it is emphatically our job to apply Humphrey’s Executor in a manner consistent with settled historical practice, the Constitution’s protection of individual liberty, and Article II's assignment of executive authority to the President. . Moreover, Congress's ability to check the CFPB is less than its ability to check traditional independent agencies. The CFPB is not subject to the ordinary annual appropriations process. Instead, the Dodd-Frank Act requires the Federal Reserve to transfer "from the combined earnings of the Federal Reserve System” the amount "determined by the Director,” not to exceed 12 percent of the "total operating expenses of the Federal Reserve System.” 12 U.S.C. § 5497(a)(l)-(2). As those who have labored in Washington well understand, the regular appropriations process brings at least some measure of oversight by Congress. The CFPB is exempt from that check. To be sure, Section 5497 is not an entrenched statute shielded from future congressional alteration, nor could it be. See, e.g., Manigault v. Springs, 199 U.S. 473, 487, 26 S.Ct. 127, 50 L.Ed. 274 (1905). But changing that statutory provision would require Congress to enact a new law. In short, the CFPB’s current exemption from the ordinary appropriations process arguably enhances the concern in this case about the massive power lodged in a single, unaccountable Director. That said, the Single-Director CFPB would constitute an Article II problem even if the CFPB were Subjéct to the usual appropriations process. The CFPB’s exemption from the ordinary appropriations process is at most just ‘‘extra icing on” an' unconstitutional “cake already frosted.” Yates v. United States, — U.S. —, 135 S.Ct. 1074, 1093, slip op. at 6, 191 L.Ed,2d 64 (2015) (Kagan, J., dissenting). . The Dodd-Frank Act contains a five-year tenure provision for the Director, see 12 U.S.C. § 5491(c)(1), akin to the similar 10-year tenure provision for the Director of the ' FBI and the 5-year tenure provision for the Commissioner of the IRS. See Crime Control Act of 1976, § 203, reprinted in 28 U.S.C. § 532 note (FBI Director ‘‘may not serve more than one ten-year term”); 26 U.S.C. § 7803(a)(1)(B) (term of the IRS Commissioner ‘‘shall be a 5-year term”). But under Supreme Court precedent, those kinds of tenure provisions do not prevent the President from removing at will a Director at any time during the Director’s tenure. See Parsons v. United States, 167 U.S. 324, 343, 17 S.Ct. 880, 42 L.Ed. 185 (1897). Therefore, I would not invalidate and sever the tenure provision. If such a tenure provision did impair the President’s ability to remove the Director at will during the Director’s term, then it too would be unconstitutional, and also would have to be invalidated and severed.